Thank you. May it please the Court, I'm Anna Haralambi for Blanca Reyes, the appellant in this case, and I will address the non-briefed issue that the Court requested from footnote 17 of the Moses case on whether or not a child can have alternating states of habitual residence. But I do want to preface that by saying that I still believe that Mexico was the state of habitual residence at the time of parental retention. And I know we asked you to address the footnote question, but I'd really like to hear first from you on the question you just spoke about. The district judge found, I take it as a matter of fact, that Arizona was the state of habitual residence of the minor. Why did – and I take it we reviewed that finding for abuse of discretion. It's a factual finding. You hear it in evidence. Why was that an abuse of discretion? Well, for a couple of things. First of all, in Moses as well as in Holder, this Court has stated that you can't take the representations of the parties at face value. You have to look at the objective facts and the entirety of the facts. Did he not? That's my question. He heard from each side. I think your client was on the telephone. He heard from the father in person, had an evidentiary hearing, listened to what they both had to say and reached a conclusion that the habitual residence of the child was Arizona. What did he do wrong in that process? Okay. He – first of all, he made certain factual findings and then made some inferences from those factual findings. The primary factual finding that Judge Collins made was that the parties originally had Mexico as the state of habitual residence. The children were born there. The parties lived there together as an intact family for a period of time. Mr. Michael's testimony and his pleadings, for that matter, were very inconsistent – internally inconsistent with when different things happened. But doesn't Mr. Michael eventually say in testimony in front of the judge, we agreed that the children would now live with me in Arizona? I understand your client disputes that and says that never occurred. But he says that the children are there. Can the judge simply say, I believe you and I don't believe her? Well, the judge can choose to believe whom he wants. However, the objective facts are inconsistent with Mr. Michael's statements. Plus, Mr. – the judge found that when the parties had reached their shared settled intent to abandon the United States as the children's state of habitual residence in favor of – I mean, excuse me, Mexico, in favor of the United States, Judge Collins said that happened in May of 2009, at the time that the father registered the birth of the children with the consular office and obtained passports for the children. And the father says at various times that he started taking the children to the United States in September 2009, in one place he wrote in December, but he did say, as did his 15-year-old daughter, that starting in May – and this is taking the facts the most favorable towards upholding what Judge Collins did – that starting in May of 2009, the children lived from Thursday to Sunday with him. Basically, the children, he says, were 4 days and 3 nights with him, 3 days and 4 nights with the mother. That's how the timing of what they said. And the mother had agreed to the Thursday to Sunday. She and her witnesses said that it didn't happen every week. Mr. Michael said that it happened the majority of the time, although he characterized that starting in September of 2000 or starting, excuse me, at Christmas of 2009, the children were in the United States about 40 percent of the time, which would be even less than that. But assume that the judge believes that that's physically where the children were. Judge Collins said it's not so important where the children actually were, how much time they were actually spending. What I am looking at is the intent of the parties, and I believe that the intent of the parties was what Mr. Michael said, that we want to have the children educated in the United States. We think they'll get better medical care and better potential government benefits in the United States. The mother, of course, denies this, but we have to look at the objective facts. You have a man who was 57 years old when these children were born, a woman who was 30 years old when these children were born, a woman who had a total of seven children, two of whom lived with her other than these twins that are at issue. Two of her older children lived with her in Nogales, Sonora. Her other three children with a different father lived in Phoenix with their father. She had lived with them in Phoenix undocumented for a period of eight years. She had gone down to Nogales, she says, because she was being abused by the children's father. She went back. She attempted to cross the border. Ultimately, she was deported and is under an exclusion, so she cannot even go to the United States to see her children who are in Phoenix. Now, at the time of this alleged shared settled intent, the children were 9 months old, and he says, well, we're going to have them raised in the United States so that they can go to school in the United States. Well, 9 months old, the children aren't going to school anywhere. He says, we're going to have them in the United States because they get better medical care. But 100 percent of the children's medical care took place in Mexico. The first time the father takes his child, either for dental care or for medical care in the United States, is more than a year after he has modestly retained them, and after he's already been served with the baby. So I take it your argument, and this argument probably goes to this question we asked you to address, is that this isn't a case of dual habitual residency because you don't think that any reasonable fact finder could find that there was habitual residency in Arizona. Correct. And that really, although it was tried to a judge and not a jury, it's the same question Judge Noonan asked in the last case, which is that you think we can hold as a matter of law that Judge Collins couldn't possibly have found that their habitual residence was Arizona. Yes, because I think this Court has made it very clear in Moses, for example, that you look at the objective facts, that you don't just rely on the statements of the parties, and that you have to – there has to be a clear, settled intent to abandon one state of habitual residence before you move to – you can adopt another state of habitual residence. And it may be irrelevant to your position in this case because you don't think there was Arizona habitual residence, but can there be shared habitual residence? You know, that's an interesting question. That's why we asked it. This is a case of first impression when you're dealing with people who, you know, are moving back and forth. And even in most of the international cases where people are moving back and forth, it's more a seasonal thing. We have a summer home here. We have another home there. We're going back and forth. Well, but your client says the evidence is in effect. It's a three-day-a-week, four-day-a-week thing. Three days a week here, four days a week there. So why isn't it, even by your own client's testimony, a dual habitual residence? Well, and I'm willing to argue that, and that's where I was going, because I think if the Court finds that the children can have alternating states of habitual residence, I would like to suggest to the Court the rule I think you ought to adopt for how you deal with that situation. Well, but then it seems to me we're then outside the Hague Convention, aren't we? Well, the Hague Convention allows you to seek relief when somebody is in effect kidnapped. Taken away from their place of habitual residence. But I'm not sure it embroils us in custody disputes about how many days a week children go to one place or another. Isn't that more properly for the family court? Absolutely, for the family court in Mexico. Or in Arizona. That's not the issue in front of us. The issue of the family court. But it is, because that's what the remedy is for wrongful retention against the state of habitual residence, is return of the child and let the state of habitual residence family court decide who's going to get custody and what that division is. Are you saying that if there is this shuttle custody, there's custody in both places, that it's still wrongful in Arizona because he was children are taken from single custody and turned into double custody unlawfully? No, I'm not saying that, because I do think the district judge, you know, I concede that he could find that, in fact, the parties had agreed that the children would live 4 days, 3 nights in the United States, 3 days, 4 nights in Mexico. So assume that the judge found dual custody. Are you entitled to any relief under your under the complaint that you filed? Absolutely. Because it's not where the children are living in that scenario is not dispositive of habitual residence. No, see, and here's my problem, and maybe that's because I don't understand the Hague. I admit that I don't understand the Hague Convention, so we'll start there. You allege this is a case brought under the implementing legislation that provides for against child abduction. Correct. And I think the child abduction statute makes it inappropriate to take somebody from their place of habitual residence to someplace else. Correct. Is it inappropriate under that statute to take somebody from their place of habitual residence to another place of habitual residence? Or are you then fighting in the family courts about what your custody arrangement is? See, that's the – I think once you – if you concede that there's dual residence here, I think it ends your Hague Convention case, doesn't it? I don't think so. And there aren't any United States cases that deal with it. There are a few cases internationally that deal with the situation of children who spend part of the year or part of the time in one country and part of the time in another country. The most specific one is a case coming out of Northern Ireland, where, similarly, the parties were unmarried. The child lived one week in Dublin in the Republic of Ireland, one week in Belfast in Northern Ireland. And the parties had pretty much, you know, reached this agreement that they were – it was not a court order. It was an agreement that was reached with the assistance of social services in Northern Ireland. The child came to Dublin according to the regular period of time when the father was entitled to have the child. Father noted bruises on the child and decided, I'm not going to return this child to Northern Ireland, called up Northern Ireland social services, says I'm not returning the child. You know, I don't think it's safe in Belfast with the mother. The mother – he told the mother, I don't remember whether it was directly or through the social worker, you can come and have supervised visitation in Dublin. And the mother did, for a couple of weeks, come down and would see the child in Dublin. And then the father said, you know what, I'm going to let you have an overnight with the child, but you have to stay in Dublin and you have to stay either at your sister's house or at this particular B&B. The mother says, okay, I'm going to do that. So the father lets her have the child. She goes to Belfast with the child. Now, during this, there's a five-week period where the child is being retained in Dublin instead of this week on, week off. And the mother never goes to court, never seeks a Hague application. Well, now the mother takes the child to Northern Ireland. And if they had been going in the normal rotation, that would have been her week to have the child in Northern Ireland. But the father claims that Dublin remains the State of Habitual Residence. He called his solicitor immediately and the next day filed his Hague complaint. And the judge in Northern Ireland said, this is one of those cases where there is alternating States of Habitual Residence, and wherever the child is at the moment, you know, there is the State of Habitual Residence, and then when the child goes to the new place, that's the State of Habitual Residence. And when the child was in Dublin, even though the child was held over, pointing out that the mother had not taken any action, then Dublin remained the State of Habitual Residence. Well, now the child is in Northern Ireland, and the father acts immediately, and the judge in Northern Ireland says, nope, you have acted in breach of the Hague Convention and returned the child to the United States. And I think that the rule that the Court ought to adopt is, if you find that there can be alternating States of Habitual Residence, such as in this case, that the State of Habitual Residence, for purposes of applying the convention, is the country where the child was supposed to be, given the already established schedule, whether that was a schedule by agreement or court order. And that's basically the rule. Kennedy, you mean if the father had returned the child, say, one more time, or filed the action when the child was supposed to be there in Arizona, that was one of his two-week periods, say? Well, they didn't share, they shared the four days. Four days the child was supposed to be with the children are supposed to be with the father. If he filed during that four-day period when they were where they were supposed to be, that would then be the home domicile? Well, no. If he had filed, let's say he had filed in Arizona for custody or done, taken some action, I think he could have done that. But the mother immediately, that night she's on the phone contacting someone. The next day she goes to Mr. Vera. I want to understand your proposed solution. When the domicile is split, you said if it's done during the period the child is in a home, in a home domicile, then that's all right. It's only when he's not where he's supposed to be. No. What I'm saying is for purposes of applying where the child is habitually resident to determine whether there was wrongful retention, because I think there's no doubt that there was a wrongful retention. I mean, you have a mother who hasn't seen her children in two and a half years. But for the, in terms of saying did he reach that, the state of habitual residence for purposes of applying the convention would be where the child was supposed to be at the time the Hague application was made, absent some kind of acquiescence. And England also had a case in Ravee that didn't say that. But that's what the law says, say at the time the application was made. And he said she's on the phone the next night. She made the application during the days that the children were supposed to be in Mexico with her. So under your position, if she'd made the application on the days that the kids were supposed to be in Arizona, the application would fail? Yes. And in fact, that's what the law says. So it's four days, three days. So if there's four days in which she can make an application and she wins, there's three days in which she can make an application and she loses. That's your position, right? The alternative possibility, which was also suggested by the English case in Ravee, was to say that the return of the child to the country, you would return the child to the country of the left-behind parent, the parent who didn't do anything wrong, and that that's the country that then gets to make the determination as to custody. Well, one of my concerns with this, and again, I may be betraying my ignorance about the Hague Convention, is that I don't think it was meant to turn the United States district courts into family courts. And so under that solution, what happens is every day of the week, as happens in family court, as you know, somebody is running to the judge and saying, my husband didn't bring the kid over, and an order is issued, and then three days later, there's another order sending the kid back. Is that really what the Hague Convention? No. And that's not what my proposal would do, either. And the Hague Convention and ACAR, the implementing legislation, specifically say you can't make a custody decision. The Court is not supposed to do that. But the underlying basis of the Hague Convention is to deter unilateral changes of the child status quo. Here, the child status quo was 4 days, 3 nights, 3 days, 4 nights in the different countries. And the father specifically altered that and unilaterally altered that. The position really is the person who alters the position is the one who is not the home domicile. Correct. Correct. And the home domicile status belongs to the one whose position was altered against her. Right. And if you look at that, at the cases that were cited in footnote 17 of Moses, that cited a Virginia court of appeals case which cited another Virginia case, Middleton, and the court there said basically we cannot ignore the fact that this was a child snatching case. Now, that was decided under the Uniform Child Custody Justice. I'd like to ask you a question about the what the judge found about the intervention of the mother on the hearing, that she was coaching people. Oh, well, I can explain that because I was there at the trial court. Unfortunately, there was supposed to be the Mexican central authority had arranged for a properly qualified interpreter in Hermosillo. My client and her witnesses could not afford the bus fare to go from Nogales to Hermosillo. We thought we were calling Hermosillo. It turned out we were calling the secretariat's office in Nogales, and there was some man there who did not speak English very well who was interpreting. And it was very, very difficult, and at certain points there was more than one person in the room, and I don't speak Spanish, so I don't know what they were saying. I don't know if Judge Collins speaks Spanish, but sometimes there was more than one person speaking in the background. And so that's what he was referring to as the possibility that somebody was being coached and maybe it was the mother. Although in talking about rejecting the witness's testimony, he does not talk about the mother, who was present in the courtroom, in Tucson, speaking in English, who clearly was not being coached. I think I've gone over my time. Thank you. Thank you. We cost you two. Please, the Court. Counsel, my name is Scott Gann. And I represent the respondent in this matter, Stephen Michael. Disagree entirely with the arguments that were made by counsel, and I believe the Court's pointed out two different reasons why the appeal, the decision of the district court should be affirmed. These are factual questions. The issue that was before the district court was whether there was the intent to abandon the habitual residents of Mexico. That's a question of fact. This Court defers to that Court, unless it's not the abuse of discretion standard, it's the clearly erroneous standard, which is you have to have a definite and firm conviction that the facts as found by the judge were wrong. There's no way you can do that on this record. And the main reason you can't find differently is because her client and all of her client was talking while they were testifying. That's in the record. That finding isn't reviewable by you unless you find that there's nothing in the record to support that, and there's testimony to support that in the record. That's why he found it. That's the main point. But the issue of intent is one that's determined not at the time there's a retention. It's determined at the time the children are first taken away. Right? It's the time when they first moved to Arizona. That's when you first look to see what their intent was. What was going on? The judge looked back in time, which was what he's supposed to do, and he said, what do these facts represent to me? What are we seeing here? Mr. Gant, the facts as I understand it really just turn on Mr. Michael's testimony and not entirely. He says our intent at the time, we agreed I would take them back to the United States. And he says, no, we never had that conversation, and you're just a liar. What other facts are there to support your side of it? I heard all the facts they think there are to support their side of it. Well, there's a couple. There for sure is the testimony of the investigator from the Mexican D.I.F. who on direct examination testified that when he asked her where the children were, she said they were living in the United States for the last two years. Now, he recanted that testimony on the motion for reconsideration, and the trial judge said, fine, then I won't rely upon that. But that certainly was evident. I'm sorry. The trial judge didn't rely upon it, so we shouldn't either. Well, he said he didn't need to rely upon it. Go through the facts. Okay. Another fact. Here are the facts. There were issuance of passports and citizenship records that he got with her permission. He didn't do this secretly without her knowledge. She didn't say no, that you can't have them. She also didn't refuse to allow them to leave. But they were U.S. citizens. They became U.S. citizens, absolutely, because he went to her and said, listen, this is going to be beneficial to us. You know from experience that people emigrate legally and illegally to the United States because of the financial benefits that can come from government assistance, better housing, education, better medical treatment. The fact that they're absolutely taken advantage of immediately isn't the test. And the question for the judge is, is it reasonable? Are these facts make sense to me? And then you have the actual conduct of them going to stay with him on a regular basis, and then what happens? He brings them back, and she doesn't appear because she has other family issues or other personal problems or she's working. So he takes them back to the United States again. He is the one that is coming across the border to deliver them. He's the one that comes to pick them up. And if she doesn't come to pick them up, he takes them back. He couldn't come across the border. I'm sorry? He couldn't come across the border. Granted, I totally agree. But the ever – what I'm trying to demonstrate is the evidence is independent of her testimony. Kennedy, is the evidence that they split the time always, that they killed and lived roughly half the time each place? That's what the trial court found. And that was based upon the evidence that was presented by both parties and what he believed to be the true facts.  There's no dispute about that. So we're left with the question of whether they intended to move them to the United States at a time in 2009 when this process began or whether that was simply happenstance, wasn't really intended to have them become American citizens and move their location from Mexico. And he found, as a matter of fact – To certainly return to their citizenship, but to live half the time each place. And after two years, after three years, to put them in school. And after they're in school, to have them live lives in this other community. Not that they wouldn't visit their mother. They could have visitation with their mother whenever they could get across the border. But the question became, did they intend to move the habitual residence from Mexico, where they were living in a difficult situation with other children and where she was having difficulty supporting them, to where he lived, had the ability to support them, could and did take care of them? That's the question. Let me ask you the question, Judge Hurwitz. Sure. If they – if the intention was they were to have domiciles in both places. Yes. And half domicile in Mexico, half domicile in Arizona. And if the court were to conclude that this is shuttle domicile, how would you then determine a case like this under the whole hate convention? Well, I think his initial response was correct. The hate convention doesn't apply. And that's both from the treatise that we all rely upon. It's from the footnotes in the Moses decision, which says that if you have dual alternating habitual residences, the hate convention can't resolve that. It's not meant to resolve that. And if you go to the treatise itself, I mean, that's the Beaumont and McIlvey treatise that the Moses court relies upon. If you go to page 91 of the treatise, the court's – the treatise says, can an individual possess more than one habitual residence at any given time? In any legal context, the designation of two or more personal laws will lead to confusion. Indeed, if a child is subject to a wrongful removal or retention between states in which he or she is habitually resident, the hate convention will not be applicable. Nevertheless, if a child is equally assimilated in two environments, should it matter whether a substantive custody determination is made in one or the other? Again, it is submitted that if one is truly – truly to respect the reality of the situation, it should not. So your position is that if there is dual residence, then this is a matter for either the Arizona or Mexico family courts. I use that – I use that term broadly. Absolutely. To issue whatever orders about custody they're entitled to issue. Yes. And – and ultimately, the petition and the denial of the petition should just be affirmed, because that's the correct answer under the hate convention analysis. The actual case that – I don't know the actual case you talked about, the Northern Ireland case, but this particular treatise, actually at page 110, right before the – it talks about concurrent habitual residence, it – it proposes a hypothetical where a child in Northern Ireland spends four days a week in one part of Ireland and three days a week in Southern Ireland. And – and it concludes, ''Faced with these facts, it is submitted that it would be artificial to designate only one place as the child's habitual residence. The only difficulty which arises from accepting concurrency in this context relates to which is the applicable law, that of Northern Ireland or that of the Republic of Ireland.'' From a theoretical perspective, there is no obvious means of resolving this problem. However, it is submitted that if the two laws diverge over the attribution of custody rights, the court sees what act to further the aims of the convention and apply the law which recognized the rights of the applicant. For example, if the case is cited above, the custody arrangement was recognized under the law of only one State, then the applicable law should be that law. So, again, it doesn't resolve the Hague Convention can't resolve that. For her to contend that the convention was designed to punish one who removes a child to another location of habitual residence or retains a child in the State of habitual residence is completely fabricated. It's not what the treatise says. It's not what Moses said in the footnote 50. When he ---- footnote 50 in that decision says, arguably, if there's dual habitual residence, and I can read that to you, in footnote 50, the Court says of Moses, ''Beaumont and McIlvey, at page 110, arguing that such a conclusion may in certain cases be theoretically appropriate and would not call for return under the convention.'' So the analysis that you asked us to be prepared to discuss does not result in the remedy that she would like, which is just that I get to win, either because this judge was wrong and he should have found that she didn't agree, although there's no doubt that she did agree, because she knew she couldn't cross the border. She knew she couldn't ---- all she had to do was not allow the children to leave Mexico. She had no obligation to let that happen. If her position was they're habitually resident here, they're my children, you want to come see them, come see them. Come any time you want. But you can't take them because I can't go. She let it go on for two years. For two years, they spent the majority of their time, according to the judge, 60-40 approximately, with him, living in the United States. And when she wasn't available or didn't show up at the border, back they went to the United States. That's what the arrangement was. He was trying to make visitation available to her, but he had changed the habitual residence. That's what the judge found. It's supported by the evidence. The intent is there. The geographic change of location there. The time for acclimatization is there. That's change of habitual residence as a matter of law. The facts and the law support the judge's decision. There's no basis to reverse it. He looked at it during the appropriate time period. The look-back is not on the day that he retains. It's on the date the change is made. Because just like they did in Moses, just like they did in every one of the cases that's cited, the Court said when they moved to Australia, what was their intent? When they came from Israel, what was their intent? Not when she decided not to return the children or to file a custody action or to seek a divorce, because by then we know what their intentions were. But it was when they had the opportunity to make a decision together, what did they seem to indicate the decision would be? You began to say. Scalia, I've forgotten in this record, where were the children born? The children were born in Mexico. In Mexico. In Mexico. So what were the requirements of United States residency in order to get citizenship? For him? Children. He had to apply for a ‑‑ for a ‑‑ I think what they call a citizenship. My question was ‑‑ I'm sorry. My question was did the children have to have residence in the United States for some period of time in order to obtain citizenship? My understanding is they didn't. They did not. They did not. Okay. It's not in the record either way, and I just ‑‑ I wasn't sure of it. Well, the actual citizenship documents are, but they're in the record. But I don't believe that there was a requirement they live in the United States. I think he could apply to get them in. He had to apply for passports, and then he had to apply for birth abroad certificates in order to support the fact that they could become American citizens. She knew about that. She didn't object to it. She knew it occurred. She allowed it to occur and go forward on that basis. That's what the judge utilized. He also ‑‑ he also utilized the testimony of the daughter. Now, the testimony he cited was the testimony of ‑‑ this is Michael's daughter, his 15‑year‑old daughter, was about the threats that she witnessed that were occurring in Mexico by the mother at some point in time when she withheld the children. But the point was that there was other witnesses that corroborated his credibility. It wasn't just based on his own belief that, gee, he's more credible than she is. It's also based on the fact that I have other people that are saying things that seem to be consistent with what he's saying, even if they're not specifically related to this agreement. Because this is one of those things of how do you prove when two people at the end of the day have agreed to something and they both now take opposite positions? You either have to have completely objective evidence or you have to look to the And that's what the judge tried to do. And that's what Judge Collins is obligated to do under those circumstances. And he did the right thing in this circumstance. I just want to end with, if I might, unless you have additional questions, there's a statement that Judge Reinhart made in the decision he wrote in In Re, B, Del, CBS, which was decided in 2009. He started his decision with this statement. It is never an easy or joyous task to resolve a dispute between parents that may determine the custody of their child, nor is the outcome ever fully satisfactory. And that's what we have here. This isn't a great situation. It isn't. But we have the parent who moved the children to a different location, established habitual residence there, and because there became problems with the other parent that lived in Mexico, decided to retain the children and continue the life they had started together. As you said later in that same decision in a footnote, you said... He's memorized all the footnotes, so you don't have to remind me. He said... You can tell us. You said that you believe that the father, who unfortunately you ruled against in that case, acted in good faith throughout the many years of separation from his child, and you hoped that some arrangement would be arrived at, regardless of any custody award, that would enable both parents to see and visit their children on a reasonable number of occasions. You know, and that's ultimately got to be the hope here, but that doesn't give rise for this Court to reverse the decision, the factually supported and legally supported decision of the district court, just because the mother is unhappy with the result. Thank you very much for your time. Thank you both. Unless you have other questions. Thank you. The case will be submitted.
judges: Reinhardt, Noonan, Hurwitz